**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

December 5, 2025

Sarah E. Delia, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor
Wilmington, Delaware 19801

Brad D. Sorrels, Esquire
Andrew D. Cordo, Esquire
Nora M. Crawford, Esquire
Joshua A. Manning, Esquire
Amanda L. Day, Esquire
Jacqueline G. Conner, Esquire
Wilson Sonsini Goodrich & Rosati P.C.
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801

RE:  *Richard Scarantino v. The Trade Desk, Inc.*
C.A. No. 2025-0442-LM

Dear Counsel:

This decision resolves exceptions to a Magistrate's final report in a Section 220 suit. The Magistrate held that the plaintiff established a proper purpose to investigate the defendant's reincorporation to Nevada and ordered the production of formal board materials on that and other subjects. The plaintiff takes exception to the Magistrate's rejection of his request for informal materials. For the reasons below, the exception is overruled.

## I.     BACKGROUND

The relevant facts are in the Magistrate's July 31, 2025 final report (the "Report").[1] Unless otherwise noted, the following background draws from that Report and the trial record.

### A.     The Trade Desk's Reincorporation

The Trade Desk, Inc. is a cloud-based advertising company cofounded by Jeff T. Green.[2] It uses a dual-class capital structure. The Trade Desk's Class A common stock is publicly traded and carries one vote per share.[3] Its Class B common stock is non-publicly traded and carries ten votes per share.[4] Green—The Trade Desk's CEO and Chairman—is the primary owner of the Class B shares.[5]

At the time of its 2016 initial public offering, The Trade Desk's certificate of incorporation stated that if the number of outstanding Class B shares fell below 10% of the total Class A and Class B shares outstanding, each Class B share would

---

[1] Magistrate's Final Report (Dkt. 39) ("Report"). Joint exhibits submitted by the parties are cited as "JX __."

[2] Report 2 (citing Pre-trial Order (Dkt. 29) ("PTO") ¶¶ 1, 3-5).

[3] *Id.* at 3 (citing PTO ¶ 4).

[4] *Id.*

[5] *Id.* (citing JX 26 at 46).

convert into one Class A share.[6]  Four years later, in 2020, The Trade Desk amended its certificate of incorporation to extend the expiration of the company's dual-class structure to December 2025.[7]  The Trade Desk's stockholders unaffiliated with Green approved the amendment.[8]

After another four years, in April 2024, The Trade Desk's Board of Directors began to discuss reincorporating the company from Delaware to another state.  The Board and its advisors explored reincorporation over the ensuing months.  Minutes reflect that the Board considered, among other things, the need for "more predictability around decision making"[9] and the distracting, "increasingly litigious environment facing corporations, particularly those with controlling stockholders, in Delaware."[10]  In September 2024, citing these reasons and a desire to "support the

---

[6] PTO ¶ 8.

[7] Report 4 (citing PTO ¶¶ 10-12).

[8] *Id.*; *see also City Pension Fund for Firefighters & Police Officers v. The Trade Desk, Inc.*, 2022 WL 3009959, at *4-5, *23 (Del. Ch. July 29, 2022) (dismissing a challenge to the 2020 amendment and holding that The Trade Desk complied with the *MFW* framework).

[9] JX 24 at 1.

[10] JX 23 at 2.

long-term success and mission of the Company, to the benefit of stockholder value," the Board approved resolutions to reincorporate The Trade Desk in Nevada.[11]

The Trade Desk filed a proxy statement on October 3, 2024 requesting that stockholders approve the reincorporation. At a November 14 special meeting, The Trade Desk stockholders voted for the reincorporation.[12] The reincorporation became effective on November 15.[13]

## B. The Demand and 220 Suit

On October 21, 2024, Richard Scarantino—a beneficial owner of The Trade Desk Class A common stock—served The Trade Desk with a demand to inspect books and records under 8 *Del. C.* § 220 (the "Demand").[14] His stated purpose was to investigate suspected misconduct concerning the reincorporation to Nevada and its effect on the company's dual-class capitalization structure.[15] He sought materials including "[d]ocuments and communications between or among the [eight] directors of the Company" about four topics: the reincorporation, the Class B conversion or

---

[11] JX 24 at 1-2.

[12] Report 6 (citing PTO ¶ 23).

[13] JX 33.

[14] Report 7; JX 28.

[15] JX 28 at 1.

any other dual-class sunset, any director conflict of interest, and the October 3 proxy statement.[16]

In response, The Trade Desk produced 521 pages of documents consisting of Board and committee minutes, meeting materials, and director questionnaires.[17] It also made a second production that included an expert advisor's engagement letter, ratified minutes, and a privilege log.[18] The Trade Desk certified that its production was complete "with respect to every category of documents that [it] had agreed to produce."[19]

Dissatisfied, the plaintiff filed a books and records action in the Court of Chancery on April 24, 2025.[20] He sought "all of the books and records identified in [his] Demand."[21]

On July 14, The Trade Desk filed a preliminary proxy statement proposing an extension of the dual-class sunset.[22] The proxy described a special committee

---

[16] JX 28 at 6.

[17] Report 7-8.

[18] *Id.*

[19] PTO ¶ 30.

[20] Verified Compl. for Relief Pursuant to 8 *Del. C.* § 220 (Dkt. 1) ("Compl.").

[21] *Id.* at Prayer for Relief.

[22] JX 68 at 23-25; *see* Report 9.

process to explore the extension and the special committee's reasons for supporting it.[23]

Two days later, on July 16, a Section 220 trial on a paper record was held before Magistrate Mitchell.[24]

### C.    The Final Report

On July 31, 2025, the Magistrate issued her Report.  She held that the plaintiff had shown a proper purpose for inspection, finding a "credible basis" to suspect that the reincorporation was part of a plan to "perpetuate [] Green's [voting] control."[25] She ordered the production of additional formal Board materials relating to "consideration of [] Green's Class B ownership" and "the sunsetting of the dual class capitalization."[26]  But she denied the plaintiff's request for informal Board materials (email) and privileged documents, reasoning that the plaintiff failed to present evidence justifying a broader inspection.[27]

---

[23] JX 68 at 23-25.

[24] Report 10.

[25] *Id.* at 8, 13-14, 16.

[26] *Id.* at 16, 27-28.

[27] *Id.* at 14, 17-19, 20-25.

The plaintiff timely took exception to the Report only as to the denial of informal materials.[28] The Trade Desk opposed the plaintiff's exception but filed none of its own.[29] The case was reassigned to me for the limited purpose of resolving the exception, which was fully briefed as of September 26.

## II. ANALYSIS

The Court of Chancery reviews a Magistrate's final report de novo.[30] Exceptions are considered "on the record before the Magistrate in Chancery, unless the [court] determines [otherwise] for good cause shown."[31] The existing record is adequate to resolve the pending exceptions.[32]

Section 220 of the Delaware General Corporation Law provides a "qualified" right for stockholders to inspect corporate books and records.[33] Once a proper

---

[28] Pl.'s Notice of Exception (Dkt. 40); Pl.'s Corrected Opening Br. in Supp. of Exception to Magistrate's Final Report (Dkt. 46) ("Pl.'s Opening Br."); *see also* Pl.'s Reply Br. in Supp. of Exception to Magistrate's Final Report (Dkt. 53) ("Pl.'s Reply Br.").

[29] Def.'s Answering Br. in Opp'n to Pl.'s Exception to Magistrate's Final Report (Dkt. 51) ("Def.'s Opp'n Br.").

[30] *See* Ct. Ch. R. 144(b)(2); *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[31] Ct. Ch. R. 144(e).

[32] *See DiGiacobbe*, 743 A.2d at 184.

[33] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006); *see* 8 *Del. C.* § 220. Section 220 was amended in March 2025. Because the Demand predates February 17, 2025, the prior version of the statute applies. *See* Del. S.B. 21 syn., 153d Gen. Assem. (2025); *supra* note 14 and accompanying text.

purpose is established, the stockholder must demonstrate that "each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[34] Documents are "necessary and essential" if they address the "crux of the shareholder's purpose" and cannot be obtained from another source.[35]

### A. The Sufficiency of Formal Board Minutes

"Formal board-level documents," such as meeting minutes, resolutions, and presentations, "are often the beginning and end of a Section 220 production."[36] The court will not order the production of email or other informal communications when "traditional board-level materials" accomplish a plaintiff's purpose.[37] A broader inspection is warranted only in extreme and "atypical circumstances," such as where

---

[34] *Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *4 (Del. Ch. Feb. 25, 2021) (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)).

[35] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 370-72 (Del. 2011).

[36] *Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *12 (Del. Ch. June 1, 2022).

[37] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752-53 (Del. 2019); *see also UnitedHealth Gp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *9 (Del. Ch. Feb. 28, 2018) (explaining that "email communications are generally the exception rather than the rule" in Section 220 actions (citation omitted)), *aff'd sub nom.*, *UnitedHealth Gp., Inc. v. Amalgamated Bank*, 196 A.3d 885 (Del. 2018).

a board neglects corporate formalities or conducts formal business through informal channels.[38]

No such atypical circumstances are present here. As the Magistrate observed, The Trade Desk's Board honored corporate formalities and kept formal records of its decision to reincorporate.[39] None of the plaintiff's arguments shows that The Trade Desk's formal Board materials fail to satisfy the Demand.

First, the plaintiff insists that email must be produced because the formal Board materials are inadequate. He describes the minutes produced to date as "short-form," "vague at best," and "reflect[ing] virtually nothing" from the Board's deliberations.[40] These characterizations are refuted by the record.

Although the Board's discussions in April and July 2024 were preliminary, the minutes reflect a process that deepened over time.[41] By August and September, the Board was receiving detailed presentations from legal counsel and a subject

---

[38] *Amazon.com*, 2022 WL 1760618, at *5, *12; *see Palantir*, 203 A.3d at 756, 758.

[39] Report 19 ("[N]o further production is necessary at this books and records stage because formal board level documents satisfy those necessary and essential to the Plaintiff's stated purpose and no evidence was presented by the Plaintiff that support the necessity for a broader inspection.").

[40] Pl.'s Opening Br. 1, 2, 21; Pl.'s Reply Br. 4-5.

[41] JX 13; JX 15.

matter expert, and exploring the merits of reincorporation.[42] The minutes apprise the plaintiff of the Board's decision-making, explaining what the Board discussed, what it decided, and why.[43] The plaintiff's wish for minutes that approximate a transcript—or advance his litigation narrative—is not a valid ground to order the production of informal communications.[44]

Second, the plaintiff contends that the formal materials are inadequate because the Board has conducted business by email. This argument rests on a misapplication of *KT4 Partners LLC v. Palantir Technologies Inc*. In *Palantir*, the court ordered the production of email because the company had a history of ignoring corporate formalities and had no responsive board-level documents.[45] The Trade Desk's Board, by contrast, maintained regular minutes about the reincorporation process.[46]

---

[42] JX 19; JXs 21-24.

[43] Report 19 ("Formal board level documents sufficient 'to effectively address the problem' have been provided to the Plaintiff and no further evidence has been presented to justify the Court to order the production of informal board materials." (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002))); *see infra* note 46.

[44] *See* Pl.'s Opening Br. 20; *In re Zendesk, Inc. Section 220 Litig.*, 2023 WL 5496485, at *12 (Del. Ch. Aug. 25, 2023) ("[M]inutes are not transcripts—they do not need to be[.]").

[45] *Palantir*, 203 A.3d at 742, 752-53, 756.

[46] *E.g.*, JX 13; JXs 15-16; JX 19; JX 21; JXs 23-24; JX 29.

*Palantir* does not support a production of email where, as here, a formal record on the subject to be investigated exists.

The plaintiff attempts to salvage this argument by pointing to a single email Green sent to the Board five years ago about a separate matter (the 2020 charter amendment).[47] This evidence is inconsequential. A director's use of email in 2020 does not support a finding that the Board abandoned corporate formalities in 2024.[48]

Thus, the formal Board materials are sufficient. The plaintiff has (or will soon have) records of Board meetings, presentations the directors received, and resolutions they adopted about not only the reincorporation but also the dual-class structure and Green's Class B ownership.[49] Section 220 requires nothing more.

---

[47] Pl.'s Opening Br. 20-21 (citing *The Trade Desk*, 2022 WL 3009959, at *4).

[48] *See Operating Eng'rs Constr. Indus. & Misc. Pension Fund v. Pioneer Nat. Res. Co.*, 2025 WL 2106580, at *4 (Del. Ch. July 28, 2025) (observing that sending texts "in one context does not entitle a stockholder to inspect that fiduciary's text[s] for all purposes").

[49] In fact, the plaintiff obtained *more* than it was entitled to. The Magistrate ordered the production of "formal board materials relating to . . . the dual class capitalization structure . . . and Mr. Green's Class B shares." Report 27-28. Neither category of documents was sought in the Demand. JX 28 at 6; *see Durham v. Grapetree, LLC*, 2019 WL 413589, at *3 (Del. Ch. Jan. 31, 2019) ("A plaintiff seeking books and records must first afford the company the opportunity to avoid litigation by making a written demand and allowing the company to comply; accordingly, she may not add new requests for documents, absent a demand, by pleading during the course of the litigation.").

## B. Disagreement with the Board's Rationale

The plaintiff next argues that he is entitled to inspect informal communications because some of the Board's stated reasons for the reincorporation—corporate "long-term vision" and the predictability of Nevada law—are "[d]emonstrably [p]retextual."[50] He asserts that, consequently, the minutes do not satisfy his purpose, necessitating an inspection of email to discover the Board's "true" motivations.[51]

This is a legally untenable contention. A Section 220 action is not the proper posture to litigate the merits of a board action.[52] If a stockholder could access informal communications simply by calling a decision "pretextual," books and records inspections would devolve into plenary discovery.[53] Such a rule would

---

[50] Pl.'s Opening Br. 23. He argues that the "only credible reason identified by the Board for the [r]eincorporation" is "insulating directors from liability with th[e] dual-class extension." *Id.* at 24.

[51] *Id.* at 19, 25.

[52] *See* Report 18 (explaining that a stockholder's disagreement with a board's conclusions or fears regarding the litigation environment is "not a justifiable reason to order the inspection of informal board materials"); *cf. Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *24 (Del. Ch. Jan. 31, 2023) (rejecting the "extreme inference" that board minutes were false, absent pled facts to the contrary).

[53] *Palantir*, 203 A.3d at 754-55 ("Books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery. . . . After all, the point of a summary § 220 action is to give the stockholder access to a discrete set of books and

invite fishing expeditions based on a stockholder's subjective views. Mere disagreement with a board's reasoning does not warrant the production of email.[54]

Neither of the plaintiff's specific arguments alter this conclusion.

The plaintiff dismisses the Board's reference to "long-term vision" as "boilerplate" because it has used the same term across many years in other contexts.[55] But the Board's consistent use of language to describe its strategy does not necessitate a search for contradictory informal communications. If anything, the repetition suggests a consistent corporate philosophy rather than a cover-up.

The plaintiff also contends that the Board's view of Nevada law as "more predictable" is "demonstrably false."[56] This is a dispute on legal theory—not

---

records that are necessary for its purpose—a set that is much less extensive than would likely be produced in discovery . . . in a plenary suit.").

[54] *Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *9 (Del. Ch. Jan. 13, 2020) ("A stockholder cannot obtain books and records simply because the stockholder disagrees with a board decision . . . ."), *aff'd sub nom.*, *AmerisourceBergen Corp. v. Lebanon Cnty. Empls.' Ret' Fund*, 243 A.3d 417 (Del. 2020).

[55] Pl.'s Opening Br. 25.

[56] *Id.* at 23, 25-26.

evidence of a failure to document deliberations. There are "competing considerations" in the relative merits of different states' corporate law.[57]

If the plaintiff believes the Board's stated reasons for supporting reincorporation are pretextual, then he can make that argument in a plenary lawsuit. For now, he has the necessary and essential documents to complete his pre-suit investigation. He is not entitled to email to test that theory before filing suit.[58]

## III.   CONCLUSION

The exception is overruled.  The Report is adopted.  IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[57] *Maffei v. Palkon*, 339 A.3d 705, 743 (Del. 2025) (cautioning against "second-guessing the judgments of the directors as to how best [to] evaluate and weigh the various competing considerations" of different corporate law regimes).

[58] *Saito*, 806 A.2d at 115 (providing that "[a] stockholder who demands inspection for a proper purpose" must be given access only to documents "necessary to satisfy" that purpose).